IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JING HUA WU, | No. C 17-2036 WHA (PR) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |
| v. | |
| JAMES ROBERTSON, | |
| Respondent. / | |

## INTRODUCTION

Petitioner, a California prisoner proceeding pro se, filed this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in state court. The judge previously assigned to this case stayed it to allow petitioner time to exhaust additional claims. After he did, and filed an amended petition, she recused herself, and the case was reassigned. Respondent filed an answer following an order show cause, and after receiving an extension of time, petitioner filed a traverse. For the reasons discussed below, the petition is **DENIED.**

## STATEMENT

I.   PROCEDURAL BACKGROUND

In November 2008, prosecutors charged petitioner in Santa Clara County Superior Court with three counts of murder and related sentence enhancements. Petitioner pled not guilty and not guilty by reason of insanity. A jury found him guilty of three counts of first-degree murder and found sentence enhancements true for the use of a firearms and for the special circumstance of multiple murders. At a separate phase, the same jury found petitioner sane on all counts. On August 2, 2013, the trial court sentenced him to a term of life without the possibility of parole,

consecutive to a term of 75-years-to-life, in state prison.

The California Court of Appeal rejected his appeal in a reasoned opinion, and the California Supreme Court summarily denied his petition for direct review. Petitioner then filed the instant federal petition. While this petition was pending, petitioner filed a habeas petition in the superior court raising new claims that he had not brought on direct appeal. The superior court denied the petition in an explained opinion. Later, the California Court of Appeal and then the California Supreme Court summarily denied similar petitions. Thereafter, petitioner filed an amended federal petition, which is the operative petition, with the following claims: (1) the trial court violated his right to due process by failing to instruct the jury on the element of heat of passion in second-degree murder and by misleading the jury on heat of passion voluntary manslaughter; (2) the trial court violated state and federal law by allowing a prosecution expert to administer a personality test upon him without ruling that the test bore a reasonable relation to his mental state; (3) the prosecutor made improper comments during closing argument at the sanity phase of his trial; (4) the state court made an unreasonable determination of two "factual issues;" (5) the trial court violated his constitutional rights by denying his claim of jury misconduct and making errors in its hearing on the issue; (6) prosecutor committed misconduct by presenting false evidence; (7) he received ineffective assistance of trial counsel; (8) he received ineffective assistance of appellate counsel; (9) the cumulative effect of the foregoing errors violated his right to due process.

II. FACTUAL BACKGROUND

From 2006 to 2008, petitioner worked as an engineer at SiPort, Inc., a designer of computer chips in Santa Clara, California. On the morning of November 14, 2008, Vice President Brian Pugh and Office Manager Marilyn Lewis met with petitioner and fired him. According to an email from Pugh, after Lewis left the room, petitioner told him, "You will pay for this. You will see. I wish you go to hell. You will not escape from earth." Petitioner denied saying this.

Petitioner asked to meet with the Chief Executive Officer Sid Agrewal and an engineering supervisor. When they met, Agrewal agreed to allow petitioner to work as a

2

consultant for three months, but petitioner did not believe him.  Petitioner returned to his desk, and after lunch, he left to buy fifty rounds of ammunition for a gun he had recently bought.  He returned to the office that afternoon, and a short while later he went to Agrewal's office.  Agrewal and Pugh were meeting, and Lewis followed petitioner into the office.  After a short verbal exchange, petitioner fired six shots and killed Agrewal, Pugh and Lewis.

After hearing the shots, the other SiPort employees left the offices.  Petitioner then left, called his wife to tell her she would have to take care of their children, and went to the bank where he deposited a check and withdrew $2000 in cash.  He drove away, parked, and spent the night in his car.  The next day, he called his wife the next day, and the police found and arrested him.

Petitioner testified that he intended to kill himself in the SiPort offices when he returned after lunch with the gun and ammunition.  He further testified that while in Agrewal's office, he fired the first shot accidentally and did not remember firing the other shots.  He testified that he was in a trance and suffering flashbacks to trauma suffered as a child being raised in China during the Great Famine and Cultural Revolution.

A number of mental health experts testified at trial.  The defense experts examined plaintiff and found that he suffered major depression, and that the stress of financial worries from real estate losses, raising small children, and losing his job caused a psychotic break such that he was not sane at the time of the shooting.  The experts for the prosecution found that petitioner suffered normal depression, was malingering, and was legally sane when he killed the victims.  The trial court appointed two additional experts who split on this issue: one concluded that petitioner suffered a disassociative disorder that caused plaintiff not to understand what was happening and made him legally insane at the time of the shooting, rendering him legally insane, but the second expert found that he was sane and did not have a psychotic break or disassociative disorder at the time of the shooting.

**ANALYSIS**

I.   STANDARD OF REVIEW

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a

federal court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id*. at 409.

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the federal habeas court looks to the last reasoned opinion from the state courts. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). When the state court has rejected a claim on the merits without explanation, this court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Harrington v. Richter*, 562

4

U.S. 86, 102 (2011).

II.   CLAIMS FOR RELIEF

    1.   <u>Jury Instructions</u>

Petitioner claims that the trial court violated his due process rights by failing to instruct the jury on the element of heat of passion for second-degree murder and by misleading the jury regarding heat of passion voluntary manslaughter (ECF No. 26-2 at 5).

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction so infected the entire trial that the resulting conviction violates due process. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *Ibid*. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982).

In addition to the standard instructions on murder, first-degree murder, and manslaughter, the trial court issued the standard instruction on provocation, which informed the jury that a provocation could reduce first-degree murder to second-degree murder, or it could reduce murder to manslaughter. A later instruction on voluntary manslaughter explained that provocation could result in voluntary manslaughter done in the heat of passion, but such a provocation had to be objectively reasonable. Petitioner argues that these instructions did not convey that murder in the heat of passion would be second-degree murder, and that they misled the jury that provocation had to be objectively reasonable to reduce first-degree murder to second-reduce murder, like the objectively reasonable provocation necessary to find heat of passion voluntary manslaughter.

The California Court of Appeal denied this claim based upon the following reasoning:

> Defendant contends the trial court failed to instruct the jury on "the elements of heat of passion second degree murder." We disagree. First, the trial court properly instructed the jury using CALCRIM No. 520 on express malice murder in the first or second degree. Second, the trial court properly instructed the jury using CALCRIM No. 521 that first degree murder (apart from lying in wait) requires premeditation and deliberation, which the instruction defined in detail. Third, the trial court properly instructed the jury using CALCRIM No. 522 that provocation could reduce first degree murder to second degree murder. These

5

instructions set forth the law that would have allowed the jury to find second degree murder on the ground that provocation had negated the existence of premeditation or deliberation. (*People v. Jones* (2014) 223 Cal.App.4th 995, 1001 (*Jones*) [no error in giving CALCRIM Nos. 521 and 522].)

Defendant contends the trial court failed to distinguish "heat of passion second degree murder" from voluntary manslaughter under heat of passion. We disagree. The trial court properly instructed the jury using CALCRIM No. 570 on the elements of heat of passion required to reduce murder to voluntary manslaughter. The court gave this instruction separately from the instruction on the possibility of provocation reducing first degree murder to second degree murder. Nothing in either of these instructions told the jury that the provocation necessary to reduce first degree murder to second degree murder required a finding that such provocation would have caused an ordinary person to react in a certain way.

The crux of defendant's argument is that the jury could have been misled into thinking that only an objectively reasonable type of provocation would have sufficed to reduce first degree murder to second degree murder. While CALCRIM No. 522—to distinguish it from the provocation necessary for voluntary manslaughter under heat of passion—could have explicitly instructed the jury that provocation sufficient to negate premeditation or deliberation need not be objectively reasonable, any ambiguity in this regard was harmless, as it was not reasonably likely the jury was confused on this point. The voluntary manslaughter under heat of passion instruction made clear that the "objectively reasonable" requirement for provocation was an element of voluntary manslaughter under heat of passion. And the trial court never used the phrase "heat of passion" in connection with the second degree murder instructions. Furthermore, the prosecution, in closing argument, distinguished the level of provocation required for voluntary manslaughter under heat of passion from that necessary to reduce first degree murder to second degree murder. Therefore, there was no danger the jury would have confused these distinct requirements.

Defendant acknowledges that his arguments were rejected by the Second District Court of Appeal in *Jones*, *supra*, 223 Cal.App.4th 995. (See also *People v. Hernandez*, *supra*, 183 Cal.App.4th at p. 1335 [approving of CALCRIM No. 522].) He contends *Jones* was wrongly decided. We disagree. We find *Jones* persuasive and we adopt its holding as to this claim.

The California Court of Appeal reasonably applied of federal law in concluding that the instructions as a whole adequately conveyed the element of second-degree murder. The trial court instructed the jury on the elements of murder, and on the elements of the two theories of first-degree murder at issue: premediated murder and lying-in-wait. The instructions were also clear that if the jury found that petitioner had committed murder (i.e. because he acted with malice), but not first-degree murder, it had to find second-degree murder. There is no dispute that these were correct statements of California law. Under these instructions, the jury would know that a murder committed in the heat of passion would be murder in the second-degree, provided that there was malice but the heat of passion negated of premeditation and lying in

6

wait. The provocation instruction further informed the jury that a provocation could be what negated premeditation or lying in wait because such provocation could reduce murder from first to second degree. The state court reasonably concluded that the instructions properly informed the jury of California law regarding how heat of passion could lead to a verdict of second-degree murder.

The state court also reasonably concluded that the instructions did not mislead the jury regarding the type of type of provocation necessary to reduce murder to second-degree or to reduce murder to manslaughter. The trial court instructed the jury that provocation must be objectively reasonable to reduce murder to manslaughter; no instruction stated that provocation must similarly objectively reasonable to reduce murder from first to second degree. There is no dispute that was a correct statement of California law. Petitioner's concern that the jury may have thought that provocation also had to be objectively reasonable in order to reduce first-degree murder to second-degree murder is unfounded. The instructions never made or implied such a requirement in the context of murder, and the instruction on the objective standard for provocation explicitly stated that it applied to voluntary heat of passion manslaughter. There are no grounds to assume that the jury also read into such instructions an additional requirement that the objective standard for provocation also applied to second-degree murder.

The state court's decision reasonably applied federal law in denying petitioner's claim that the jury instructions misstated state law or were misleading so as to violate petitioner's right to due process. Therefore, petitioner may not obtain federal habeas relief on this claim.

2.      Administration of Personality Test

Petitioner claims that the trial court violated California Penal Code § 1054.3(b)(1)(B) by allowing a prosecution expert, Dr. Mohandie, to administer the Minnesota Multiphasic Personality Inventory - II ("MMPI - 2") without finding that the test bore a reasonable relation to petitioner's mental state (ECF 26-2 at 11). He also claims that this error was of "constitutional magnitude." He further claims that the state court's ruling allowing the expert to perform the test and to testify about its results was an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2).

7

Petitioner's state law argument fails both because failure to comply with state law is neither a necessary nor a sufficient basis for granting federal habeas relief, s*ee Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999), and because the state appellate court's ruling that the trial court did not violate state law is binding in on federal habeas review, *see Mendez v. Small*, 298 F.3d 1154, 1158 (9th Cir. 2002). The claimed violation of California Penal Code § 1054.3(b)(1)(B) does not afford petitioner grounds for federal habeas relief.

Petitioner's argument that the trial court's asserted violation of state law is of "constitutional dimension" also does not present grounds for relief because allowing the expert to administer the test and admitting its results was neither "contrary to nor an unreasonable application of clearly established Supreme Court precedent" under 28 U.S.C. § 2254(d)(1). Petitioner cites no Supreme Court precedent, nor is any apparent, that an expert's administration of a mental health test on its own implicates a defendant's right to due process or other constitutional right. As to admitting the test results into evidence, the defense had the opportunity to cross-examine the expert on such results, the test was not a major part of his testimony that petitioner was sane, and petitioner presented his own experts that he was insane. In any event, the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). Because there is no such Supreme Court case, the admission of the test results was not contrary to or an unreasonable application of Supreme Court precedent and cannot be grounds for federal habeas relief under section 2254(d)(1). *See Zapien v. Martel*, 849 F.3d 787, 794 (9th Cir. 2016) (because there is no Supreme Court case establishing the fundamental unfairness of admitting inadmissible and prejudicial testimony, *Holley* bars any such claim on federal habeas review). Accordingly, the trial court's allowing the expert to administer the test and admitting its results does not entitle petitioner to habeas relief.

Petitioner is wrong that the trial court's ruling allowing the test and admission of its results was an unreasonable factual finding warranting relief under 28 U.S.C. § 2254(d)(2). California Penal Code § 1054.3(b)(1)(B) required the trial court to make a threshold

1  determination that the proposed test bear "some reasonable relation to the mental state placed in
2  issue" before allowing the test to be administered or admitting its results.  The reasonableness
3  of the relationship was not a matter of historical or then-existing fact, but rather a judgment or
4  conclusion applying a reasonableness standard to a set of facts.  As such, it was not a factual
5  finding subject to review under 28 U.S.C. § 2254(d)(2).

6  The state courts' rejection of this claim did not unreasonably apply federal law or rest on
7  unreasonable factual findings, and petitioner may not receive habeas relief on this claim.

3.  Prosecutor Comments

Petitioner claims that the trial violated his right to due process because the prosecutor made improper comments during closing argument of the sanity phase of his trial (ECF 26-2 at 12).  Specifically, petitioner cites the prosecutor's comments that state hospitals are "cushy," that petitioner had a "motive for being mentally ill," and that a finding of insanity would be "a slap in the face to justice."

The California Court of Appeal rejected this claim on procedural grounds, not on its merits.  As a result, the state court's decision does not receive deference under 28 U.S.C. § 2254(d), but rather review of this claim is de novo.  *Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002).

A prosecutor's misconduct violates a defendant's due process rights when such misconduct renders the trial "fundamentally unfair."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  The weight of the evidence against the defendant compared to the importance and extent of the comments are critical factors to this determination.  *See United States v. Young*, 470 U.S. 1, 19 (1985) (weight of evidence of guilt); *Giglio v. United States*, 405 U.S. 150, 154 (1972) (whether comments relate to critical part of case); *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987) (whether comments isolated or part of ongoing pattern).

Here, the evidence of petitioner's sanity was strong, as measured by the evidence that he premeditated, deliberated and was conscious of his wrongdoing.  The sequence of his actions progressed steadily from learning that he would be fired towards killing the victims: he left the office, retrieved his gun, bought a large amount of ammunition, loaded his gun, put on a jacket

9

1  and concealed the gun before returning to his office, waited until he was inside Agrewal's
2  office, spoke to the victims, shot them at close range in the head, and checked on two of them
3  before leaving to be sure they were dead. Moreover, he showed awareness of his wrongdoing
4  when he concealed the weapon before the shooting, and then after the shooting told his wife that
5  she would have to care for their children by herself, turned off his cellphone to avoid detection,
6  spent the night in his car, and withdrew a large amount of money, which was consistent with a
7  plan to flee. This objective evidence of his deliberate actions and understanding of wrong
8  strongly outweighed the contrary evidence of his insanity, which consisted of petitioner's
9  subjective and self-serving statements and the opinions of experts largely based upon such
10 statements.

11     By contrast, the prosecutor's comments were an extremely insignificant part of her
12 closing argument. They were short and isolated phrases in a lengthy (60 transcript pages)
13 argument addressing Petitioner's burden to prove insanity, the elements of the defense, and the
14 evidence against petitioner. The comments were not part of a larger theme or theory of the
15 prosecution of the defense. In addition, the comment that petitioner believed the mental
16 hospital would be "cushy" pertained to the relevant topic of his motive to lie and possible
17 malingering, not to the impermissible topic of the conditions he would face if found insane.
18 The prosecutor's relatively insignificant comments had little impact on a trial in which there
19 was such strong evidence of petitioner's legal sanity.

20     In addition, the trial court instructed the jury specifically that it could not consider what
21 would happen to petitioner as a consequence of being found not guilty by reason of insanity,
22 including his placement in a hospital, and that the comments of attorneys are not evidence.
23 Such instructions further ensured that the prosecutor's comments did render the trial
24 fundamentally unfair. *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (curative instructions);
25 *Boyde v. California*, 494 U.S. at 384; (comments of the attorneys do not carry the same weight
26 as instructions by the court).

27     Viewing the trial as a whole, the prosecutor's few, isolated comments did not so infect
28 the trial so as to violated petitioner's right to due process. For the same reasons discussed

10

1  above, the comments did not have a substantial and injurious effect or influence in determining
2  the jury's verdict; therefore, they did not cause the prejudice necessary to warrant habeas relief.
3  *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).

### 4. Determination of "Factual Issues" Regarding Expert Testimony

Petitioner claims that the state court made "unreasonable factual determinations" in two instances: the false testimony by one of the prosecutor's witnesses, Dr. Hughey; and the determination that Dr. Mohandie could administer the MMPI-2 test to assess petitioner's personality.

*First*, the claim regarding the allegedly false statements by the Dr. Hughey is not exhausted because petitioner did not fairly present it to the California Supreme Court or in any state appellate court. State prisoners who wish to file a federal habeas petition must first exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. 28 U.S.C. § 2254(b),(c). As petitioner did not raise this claim in the state courts, it is not exhausted and will be stricken from the amended petition. *See Rhines v. Weber*, 544 U.S. 269, 277 (2005) (when faced with a mixed petition, unexhausted claims may be stricken without prejudice). If petitioner exhausts the claim, he may seek to bring it in a new petition in federal court. *Second*, the purportedly false statements by Dr. Hughey — discussed below regarding plaintiff's claim of that the prosecutor presented false evidence — were not factual determinations by the state courts, and thus are not reviewed for unreasonableness under 28 U.S.C. § 2254(d)(2).

Petitioner's claim that the trial court made unreasonable factual determinations in allowing and admitting the Dr. Mohandie s administration of the MMPI-2 test is addressed and denied, above.

### 5. Jury Misconduct

Petitioner claims that Jurors 4 and 5 prejudged the evidence and his innocence, and that their statements to that effect influenced the other jurors; he also argues that the trial court committed errors in its hearing on such misconduct (ECF No. 26-3 at 6-10, 26-1 at 2-17). The

11

1   superior court largely denied this claim for procedural reasons in an explained opinion, and the
2   California Court of Appeal and the California Supreme Court denied the claim on its merits,
3   albeit summarily.

4   The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of
5   impartial jurors. U.S. Const. amend. VI. Premature deliberations can undermine such a right,
6   but they are not as serious as private communication, contact or tampering. *Davis v. Woodford*,
7   384 F.3d 628, 653 (9th Cir. 2004). "What is crucial is not that jurors keep silent with each other
8   about the case but that each juror keep an open mind until the case has been submitted to the
9   jury." *Id.* at 653 (internal quotation and citation omitted).

10  During the sanity phase of the trial, Juror 3 alleged that Juror 5 had stated on "many
11  many" occasions that petitioner was guilty prior to submission of the case in the guilt phase,
12  and that Juror 4 had also prematurely stated that the prosecution's expert was the only credible
13  expert. The trial court held a hearing and questioned each juror to determine whether they had
14  heard such statements from Jurors 4 and 5, questioned Jurors 4 and 5 about whether they had
15  made such statements, and questioned Juror 3 on his recollection of the specific circumstances
16  of each instance in which Jurors 4 and 5 had allegedly made such statements. Based on the
17  testimony that no other jurors had heard such statements outside of deliberations, indications
18  favoring the other jurors' reliability over that of Juror 3 on this issue, and the lack of evidence
19  that the other jurors were in an agreement to lie about what Jurors 4 and 5 said, the trial court
20  found that Juror 3 mistakenly recollected that Jurors 4 and 5 made the alleged statements, or
21  that if they did so, they made the statements during deliberations. The trial court found that
22  Jurors 4 and 5 did not commit misconduct by improperly prematurely deliberating and did not
23  influence other jurors into doing so. In that basis, the trial court concluded that there was no
24  misconduct and the jury was not biased.

25  The record does not support overcoming the presumption of correctness afforded to the
26  trial court's the factual findings that Jurors 4 and 5 did not make the statements about their view
27  of the case outside of deliberations, and that they did not prematurely decide the case or
28  influence other jurors to do so. *See* 28 U.S.C. § 2254(e)(1). Upon questioning, it was clear that

12

1  Juror 3 could only recall four instances of alleged improper statements by Juror 5. No other
2  juror recalled Jurors 4 or 5 making such statements, and some of them were "emphatic" in
3  denying such statements. By contrast, Juror 3 was late to court four times, was often fatigued,
4  once fell asleep during trial, had issues with his eyes, and had some conflict with Juror 5.
5  Petitioner has not rebutted the presumption that the trial court's findings that the Jurors 4 and 5
6  did not prematurely decide the case or influence the other jurors into doing so. Given these
7  presumptively correct factual findings, the state courts reasonably found that the jury did not
8  commit misconduct so as to violate petitioner's Sixth Amendment right to an unbiased jury.

Petitioner argues that the trial court's hearing was deficient. Such an argument is not, on its own, a basis for federal habeas relief because clearly established federal law, as determined by the Supreme Court, does not require state or federal courts to hold a hearing when a claim of juror bias is raised by the parties. *Tracey v. Palmateer*, 341 F.3d 1037, 1045 (9th Cir. 2003). A court confronted with a colorable claim of juror bias will generally conduct a hearing, however, to explore the issue of juror bias and provide the defendant an opportunity to prove actual bias. *See Hedlund*, 854 F.3d at 574. And so long as the fact-finding process is objective and reasonably explores the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness. *Id.*

Petitioner's complaints about the hearing do not undermine the presumption of correctness should not apply. *First*, he complains that the trial court violated California Evidence Code 1150(a), (b) and Federal Rules of Evidence 606(b)(2). Federal Rule of Evidence 606(b) and California Evidence Code section 1150(a) prohibit the use of juror testimony to impeach a verdict when that testimony relates to intrinsic matters, i.e., the internal, mental processes by which the verdict was rendered. "[L]ong-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry." *Tanner v. United States*, 483 U.S. 107, 127 (1987). The transcript shows that the trial court initially asked jurors whether they heard statements from Jurors 4 or 5 prematurely judging petitioner's guilt or innocence, and if so whether that impacted their decision. The trial court also asked Jurors 4 and 5 whether they had made such statements and whether they had prematurely decided the

13

case. The transcript is clear, however, that the trial court subsequently recognized that it was inappropriate to ask about the jurors' decision-making, and that the court did not rely on the answers to such questions in finding no misconduct.

*Second*, petitioner complains that the trial court pressured jurors to report that any misconduct had occurred in the deliberation room. The transcript of the hearing does not bear this out, but rather shows that the trial court conducted a thorough hearing into all of the allegations by Juror 3 about statements by Jurors 4 and 5. The court questioned each and every juror and alternate, questioned Jurors 4 and 5 under oath, and questioned Juror 3 twice. The court methodically required Juror 3 to identify each and every instance in which any other jurors may have made improper statements and then asked about the surrounding circumstances, the context, and which other jurors who were present. And when Juror 3 began to discuss matters that occurred inside the deliberation room, the trial court admonished him not to divulge such matters, in accordance with applicable law. The transcript shows no sign that the trial court foreclosed any inquiry into matters outside the deliberation room in the manner petitioner suggests.

*Third*, petitioner complains that the trial court rejected counsel's request to investigate misconduct during the deliberations process and banned inquiry into what happened in the deliberation room. As indicated above, such limitations were a proper application of federal law prohibiting intrusive inquiry into jury deliberations. *See Tanner*, 483 U.S. at 127.

The state court correctly, and reasonably, denied this claim.

      6.     <u>Prosecutorial Misconduct - False Evidence</u>

Petitioner claims that the prosecutor committed misconduct in several respects: presented false testimony by an expert that petitioner had threatened one of the victims prior to the shooting, presented photographs of an altered crime scene, altered a transcript of petitioner's prior statements and MMPI-2 answer sheet, and presented false testimony about petitioner's phone calls to his wife on the day of the murders (ECF Nos. 26-3 at 10-11, 26-1 at 17-22). The California Court of Appeal and California Supreme Court summarily denied this claim on the merits.

14

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976). So must a conviction obtained by the presentation of false evidence. *United States v. Bagley*, 473 U.S. 667, 678-80 nn.8-9 (1985). Such a claim succeeds when (1) the testimony or evidence was actually false, (2) the prosecution knew or should have known that the testimony or evidence was actually false, and (3) the false testimony or evidence was material. *Henry v. Ryan*, 720 F.3d 1073, 1084 (9th Cir. 2013). Conclusory assertions will not do. *Ibid*. The materiality standard requires only that "the error *could* have affected the judgment of the jury, whereas ordinary harmless error review requires us to determine whether the error *would* have done so." *Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013).

Petitioner's first claim is that the prosecutor presented "false" testimony by the witness Dr. Hughey that petitioner had threatened one of the victims, Brian Pugh, on the day of the murders as well as months earlier. The trial records show, however, that during his testimony, Hughey admitted that he was mistaken and that petitioner had not in fact made such threats. There is no evidence that the prosecutor knew that Hughey's initial testimony was inaccurate, *see Reis-Campos v. Biter*, 832 F.3d 968, 977 (9th Cir. 2016) (claim that only the witness knew testimony was false, and not the prosecutor, is not a valid basis for federal habeas relief), and Hughey's correction of the inaccuracies ensured that it did not have any adverse effect.

Petitioner asserts that the police altered the crime scene, but this assertion is based on inconsistencies between photographs of the scene and witness testimony as to the location of bodies and furniture. Such inconsistencies do not establish that the photographs were false, as opposed to the testimony, let alone that the prosecutor knew them to be false. Furthermore, the jury knew about the inconsistencies because the witnesses testified as much, which allowed the jury to weigh the accuracy of the photographs.

Petitioner claims that the prosecutor altered a portion of the transcript of his statement to the police that Pugh threw a chair at him prior to the shooting to state that Pugh simply picked up the chair. Pugh's throwing the chair would advance the defense argument that petitioner

15

1  shot the victims during a disassociative state. The record does not support petitioner's claim
2  that the prosecutor made inaccurate changes to the transcript. Petitioner represented himself for
3  a period of time before trial, and he and the prosecutor agreed to make changes to the transcript
4  to align with the video recordings. There is no evidence that the prosecutor changed the
5  transcript, as petitioner alleges, much less that she knew such a change would be false; indeed,
6  in two other places in the transcript petitioner stated that Pugh "picked up" the chair, not that he
7  threw it.

8  Petitioner claims that the prosecution expert, Dr. Mohandie, doctored the test results for
9  the MMPI-2 test by filling in some of the answers that petitioner had left blank. He does not
10 offer any evidence to support this assertion. Petitioner also claims that testimony by the police
11 officer who interviewed petitioner's wife falsely represented the timing of his three phone calls
12 to her on the day he killed the victims. This officer testified to what petitioner's wife told him,
13 however, not to his knowledge of when petitioner actually made the calls. Even if the times
14 were in fact inaccurate, there is no evidence that was due to the officer falsifying evidence
15 rather than petitioner's wife's inaccurate memory of the precise times of the calls. Most
16 importantly, petitioner offers no evidence that the prosecutor knew either that Dr. Mohandie
17 had answered the test questions falsely or that the officer falsely represented what petitioner's
18 wife told him. Moreover, all of this evidence was subject to cross-examination and the jury
19 received petitioner's account of his answers to the personality test and the times of his phone
20 calls to his wife.

21 The trial record establishes that the prosecutor did not violate petitioner's due process
22 rights by knowingly presenting false testimony or false evidence. The state courts therefore
23 correctly rejected this claim.

24       7.     <u>Ineffective Assistance of Trial Counsel</u>

25 Petitioner contends that trial counsel provided ineffective assistance as follows: (1)
26 counsel failed to provide him a copy of the answer sheet to the MMPI-2 test prior to trial, failed
27 to inform him of Dr. Mohandie's (the prosecution expert) prior experience with the Los Angeles
28 Police Department, and was not present when petitioner took the MMPI-2 test; (2) he did not

16

elicit testimony by Hien Tram that he overheard Lewis state that she was escorting petitioner to Agrewal's office just prior to the shooting; and (3) he did not rebut or seek to strike purportedly altered photographs of the crime scene (ECF No. Dkt. 26-1 at 24-25).

In order to succeed on a claim that he has received ineffective assistance of counsel, a petitioner must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which requires him to show deficient performance and prejudice.  Under the deficient-performance prong, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688.  Judicial review of the performance of defense counsel must be "highly deferential," taking into account that there is a "wide range of reasonable professional conduct" and a "strong presumption" that counsel's conduct fell within that range. *Id.* at 689.  Under the prejudice prong of the *Strickland* test, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

*First*, petitioner has not established prejudice from counsel's handling of the prosecution expert Dr. Mohandie.  The MMPI-2 personality that Mohandie administered on petitioner was not a significant basis for Mohandie's testimony that petitioner was legally sane, the defense had and took the opportunity to present multiple experts to testify to petitioner's insanity, and the defense took cross-examined and argue against Dr. Mohandie's conclusions.  Defense counsel knew about Dr. Mohandie's prior work for the police, and the jury learned of this fact at trial; petitioner does not explain how his personal knowledge of this information would have made any difference at trial.  He also does not explain how defense counsel's presence when he took the MMPI-2 test would have changed his answers or what useful evidence he would have found if he had a copy of his answers before trial.  Petitioner has not shown that these steps by counsel would have had a reasonable likelihood of changing the verdict.

*Second*, there is no support in the record that defense counsel could have elicited testimony from Hien Tram that Lewis escorted petitioner into Agrewal's office before the shooting.  The relevant police report shows no such statement by Tram.  According to the

17

report, Tram simply saw Lewis walk behind petitioner into Agrewal's office, and that Tram offered testified to this effect. As there is no evidence that Tram saw Lewis escort petitioner to the office, defense counsel did not perform deficiently or prejudicially by failing to elicit such testimony from Tram.

*Third*, petitioner's complaint that trial counsel did not rebut or seek to strike photographs of an crime scene altered by the police fails because there is no evidence that the police in fact altered the scene. As discussed above, the mere fact that witness testimony was inconsistent with the photographs does not mean that the photographs were wrong or that the police altered the crime scene. Moreover, the jury heard about these inconsistencies and was able to decide what to believe. Petitioner has not shown that counsel acted unreasonably or prejudicially with regard to the crime scene photographs.

Petitioner's claim for federal habeas relief on the basis of ineffective assistance of trial counsel fails because the state courts reasonably applied federal law in denying this claim.

8. Ineffective Assistance of Appellate Counsel

Petitioner claims that appellate counsel was ineffective in failing to bring the above-discussed claims of jury misconduct, false evidence, and ineffective assistance of trial counsel (ECF No. 26-3 at 13-15; 26-1 at 27-28). For the reasons discussed, these claims are meritless. Appellate counsel will frequently remain above an objective standard of competence and have caused his client no prejudice for the same reason: because he declined to raise a meritless issue. *Miller v. Keeney*, 882 F.2d 1428, 1434 n.10 (9th Cir. 1989). That was the case here. The state courts' rejection of this claim was a reasonable application of federal law, and petitioner shall not receive habeas relief on this claim.

9. Cumulative Error

Petitioner claims that the foregoing claimed errors accumulated to render the trial fundamentally unfair in violation of his right to due process (ECF No. 26-3 at 13-15; 26-1 at 27-28; No. 26-2 at 16). For the reasons discussed above, petitioner's claims do not establish constitutional error, and there are no errors to cumulate. Accordingly, petitioner's claims of cumulative error fail.

## CONCLUSION

For the foregoing reasons, the petition is **DENIED**.

A certificate of appealability will not issue because reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may seek a certificate of appealability from the United States Court of Appeals.

The clerk shall enter judgment in favor of respondent, and close the file.

**IT IS SO ORDERED.**

Dated: September  30 , 2020.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE